Filed 5/23/23  P. v. Garcia CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DANIEL GARCIA,<br><br>    Defendant and Appellant. | E078159<br><br>(Super. Ct. No. RIF1802162)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Bernard J. Schwartz, Judge.  Affirmed with directions.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland , Assistant Attorney General, Christopher P. Beesley and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

## I.

## INTRODUCTION

While sitting in the backseat of a car, defendant and appellant Daniel Garcia shot the driver and her passenger in the head, killing them both. A jury convicted him of two counts of first degree murder, and the trial court sentenced him to two consecutive life terms without the possibility of parole, plus 25 years.

Defendant argues his convictions must be reversed because (1) there was no substantial evidence that the murders were premeditated, (2) the trial court erroneously allowed the jurors to begin deliberations shortly after closing arguments, and (3) the trial court erroneously required his expert witness to testify before he testified. We reject these arguments. Defendant also contends, and the People concede, that the parole restitution fine must be stricken and that the sentencing minute order and the abstract of judgment must be corrected. We agree. As modified, the judgment is affirmed.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant woke up his niece, G.B., in the middle of the night and told her to follow him. After following defendant out of her bedroom, he told her that he had killed two people. G.B. thought defendant was lying or on drugs, but he told her that he could show her the bodies.

2

They got into the car and G.B. drove for a few minutes until approaching a car parked on the shoulder. G.B. saw blood on the car's windshield and two bodies inside. Defendant asked her to help get rid of the bodies, but she refused and drove back home.

When they got back home, G.B. told her aunt that defendant had shot two girls, they immediately called 911. While waiting for the responding officers, G.B. noticed defendant had blood on his arm and hand. Defendant noticed the blood and began wiping it off while stating, "I have it all over me."

G.B. told the responding officers that defendant told her he killed two girls because he was tired of them and they threatened his family. G.B. then took the officers to the crime scene.

One of the victims, Miranda Duran, was in the driver's seat while the other, Gabriela "Gabby" Perez, was in the front passenger seat. The officers found a "copious amount of blood" throughout the front of the car, including blood spatter on the front windshield. There was a child's car seat in the back right seat, so the only place someone could have been sitting was behind the driver. The evidence thus suggested that the shooter sat in the backseat behind the driver.

The officers arrested defendant and found a pistol, magazine with ammunition, and box of ammunition in his pockets. He also had a key fob for Duran's car. A DNA test revealed the blood on defendant's clothes was Duran's.

An autopsy of the victims showed that Duran suffered a gunshot to the left temple with an exit wound near her right ear and that the gun was within two feet from her face

3

when fired. Perez suffered a gunshot to her left ear with an exit wound in the back of her head. Neither victim had any defensive wounds.

Defendant testified in his defense. The following is his version of events.

Defendant was romantically interested in Duran, but she only wanted to be friends and had a boyfriend at the time of the incident. Defendant did not like Perez, but Duran had previously dated her, so defendant hung out with Perez only because of Duran.

On the day of the incident, Duran went to defendant's house to hang out. They eventually drove in Duran's car to hang out with Perez. The three of them got food and decided to go shooting, so they drove to defendant's house to get his gun and ammunition. They drove to a less crowded area and defendant shot the gun two or three times out of the window and into the air. At some point, defendant gave the gun to Perez.

Defendant said he had to go home so Duran started driving to his house. Defendant was in the back left seat and Perez was in the passenger seat. As they drove back, Perez started talking down to him, calling him stupid, and telling him he should not have shot the gun because she was on probation. Perez kept putting him down and started "[gang]banging on [him]," "throwing her hood on [him]," saying, "South Side Riva" (a gang), and "getting aggressive."

Defendant started feeling anxious, distrustful, and more on guard while Perez kept "mouthing off." Defendant apologized and tried to diffuse the situation, but Perez kept being rude and putting him down.

4

Defendant then asked Perez to give him his gun. After she handed it to him, he cocked it. Perez said something like, "You think you're bad with that? I'll take it away from you," and turned around. By cocking the gun, defendant was trying to send a message like "Leave me alone" and calm the situation, but when Perez responded, he "panicked" and "just reacted" and shot her because he felt threatened by her. After shooting Perez, he "panicked," "didn't know what to do," and "just reacted the same way" and shot Duran.

A jury convicted defendant of two counts of first degree murder (Pen. Code, § 187, subd. (a); counts 1 & 2)[1] and found true as to each count that defendant personally and intentionally discharged a firearm causing death (§ 122022.53, subd. (d)). The jury also found true a multiple murder special circumstance. The trial court sentenced defendant to two consecutive terms of life imprisonment without the possibility of parole for the murder convictions plus two consecutive terms of 25 years to life for the firearm enhancements.

## III.

## DISCUSSION

A. *First Degree Murder Convictions*

Defendant contends insufficient evidence supports his first degree murder convictions because there was no substantial evidence of premeditation. We disagree.

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

"'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) We may reverse a conviction for a lack of substantial evidence only if it appears ""that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].""" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

Murder is the unlawful killing of a human being with malice aforethought, and it is in the first degree if it is "'willful, deliberate, and premeditated.'" (*People v. Morales* (2020) 10 Cal.5th 76, 88.) Evidence sufficient to support "a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what [the] defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; [and] (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)

There was substantial evidence with respect to all three of these factors. As to the first, there was sufficient evidence of planning activity. After firing the shots into the air, defendant gave Perez his gun, but asked for it back when she began disparaging him. He then cocked the gun and held it in a ready-to-fire position while Perez taunted him. The

jury could reasonably find this evidence showed that defendant planned to shoot the victims.

There was also substantial evidence that defendant had a motive to kill both victims. Given his exchange with Perez, the jury could reasonably find that defendant killed her because he disparaged him in front of Duran, who he was romantically interested in. (See *People v. Jackson* (1989) 49 Cal.3d 1170, 1200 [defendant's anger at the way the victim talked to him was sufficient evidence of motive].) The jury could also reasonably find that defendant killed Duran because she was the only witness to Perez's murder. (See *People v. Thomas*, *supra*, 2 Cal.4th at p. 519 [the "defendant's need to eliminate a witness" was sufficient motive for first degree murder].)

Finally, the way defendant committed the killings supported the jury's finding that they were deliberate and premeditated. Both killings were "accomplished by a single execution-style shot fired from close range into [the victims' heads], in circumstances showing no evidence of a struggle. This plainly supports a finding of premeditation and deliberation." (*People v. Stewart* (2004) 33 Cal.4th 425, 495.)

Because there was substantial evidence of all three *Anderson* factors, substantial evidence supports defendant's first degree murder convictions.

B. *Juror Deliberations*

Defendant contends the trial court erroneously allowed the jury to begin deliberations on a Thursday afternoon after closing arguments because the jurors would have only two hours to deliberate until adjourning and would not return until the

8

following Tuesday, which would require an alternate juror because one juror had a death in the family and would not be available on Tuesday. Defendant argues that the trial court thus improperly allowed a juror with a known hardship to deliberate and pressured the jury to quickly reach a verdict. We find no error.

On the last morning of trial, Thursday, October 7th, just before the court instructed the jury and counsel presented closing arguments, Juror No. 8 told the court that his brother-in-law had died. Juror No. 8 confirmed that he was available to deliberate that day and the next day, but then he would be flying out of state that weekend.

The trial court asked Juror No. 8 if he would be "able to concentrate and be engaged in what's going on" and deliberate in the afternoon and the next day, if necessary. Juror No. 8 confirmed that he would. The trial court then asked the other jurors if anyone was unavailable the next day, even though court would not be in session, and "[a] lot" of them said they were unavailable. After a sidebar with counsel, the trial court told the jury that they would deliberate that afternoon for "whatever time" was left for deliberations, then they would return on Tuesday (because Monday was a court holiday) with an alternate substituting in for Juror No. 8.

Around 2:30 p.m. on Thursday, after closing arguments and instructions, the trial court told the jurors to deliberate until 4:15. If there was no verdict by then, they would be adjourned and return on Tuesday. The jury began deliberating around 2:30 p.m. and returned their unanimous guilty verdicts around 3:42 p.m.

9

Under section 1089, the trial court may discharge a juror at any time if there is good cause showing that the juror cannot perform his or her duty. (§ 1089.) "The juror's inability to perform must appear as a 'demonstrable reality' and will not be presumed." (*People v. Lucas* (1995) 12 Cal.4th 415, 489.) We review the trial court's finding whether good cause exists to discharge a juror for an abuse of discretion. (*People v. Guerra* (2006) 37 Cal.4th 1067, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

We see no abuse of discretion here. Juror No. 8 told the trial court on a Thursday morning that he would be flying out of state that weekend because his brother-in-law had died. The trial court then asked Juror No. 8 whether he would still be able to perform his duties, including paying attention on the last day of trial and deliberating, and he confirmed that he could and would do so. Nothing in the record suggests that Juror No. 8 could not discharge his duties. There is thus no evidence that it was a "'demonstrable reality'" that Juror No. 8 could not continue to serve as a juror or was unwilling to do so. (*People v. Lucas*, *supra*, 12 Cal.4th at p. 489.)

*People v. Beeler* (1995) 9 Cal.4th 953 (*Beeler*), abrogated on another ground as stated in *People v. Pearson* (2013) 56 Cal.4th 393, 462, is directly on point here. On a Tuesday morning, the third day of the jury's penalty phase deliberations in a death penalty case, a juror told the trial court that his father had died and he would have to fly out of state at 2:00 p.m. (*Beeler*, *supra*, at p. 986.) The trial court told the juror that the jury would be adjourned that day at noon but that he would be expected to come back the

following Monday to resume deliberations. (*Ibid.*) Later that morning, however, the jury returned a death verdict. (*Ibid.*)

Our Supreme Court rejected the defendant's argument that the verdict was coerced and an abuse of discretion under section 1089. (*Beeler*, *supra*, 9 Cal.4th at p. 989.) The court noted that the recorded "support[ed] no inference that [the juror] was coerced" given that "[h]e did not request to be discharged" and did not "object to the trial court's decision to allow deliberations to continue briefly." (*Ibid.*) The court thus found that "to accept defendant's claim of jury coercion, we would have to assume without any evidence in the record that [the juror] was so distracted by his father's death that he felt compelled to return a speedy verdict or that other jurors were aware of the situation and were somehow affected by it." (*Ibid.*) The court declined to do so, and instead found that there was no "demonstrable reality' that [the juror] was unable to discharge his duties or that he felt coerced to return a verdict" or that "any other juror was affected by the circumstances." (*Id.* at p. 990.) The trial court therefore did not abuse its discretion under section 1089 in declining to discharge the juror.

So too here. Juror No. 8 did not request to be discharged "or even to be accommodated by not having to deliberate that day." (*Beeler*, *supra*, 9 Cal.4th at p. 990.) The trial court asked Juror No. 8 whether he was able to discharge his duties that day, and he confirmed that he could. The trial court was entitled to accept Juror No. 8's representations and was in the "best position" to determine whether it was necessary to inquire further about his ability to serve as a juror. (*People v. Ramirez* (2006) 39 Cal.4th

11

398, 461.) Although the trial court told the Juror No. 8 that he would not have to return the following court day, Juror No. 8 never "asked for additional time, disagreed with the court's proposal, or was subjected to any time pressure," which further shows that Juror No. 8 was not coerced into hastily reaching a verdict. (*Beeler*, *supra*, at p. 990.) And, as in *Beeler*, there is no evidence that any other juror was similarly coerced. To find that Juror No. 8 or any other juror was coerced into quickly reaching a verdict would require us to improperly speculate without evidence of coercion in the record. (See *id*. at p. 989.)

In short, the trial court did not abuse its discretion under section 1089 by allowing the jury to begin deliberating right after closing arguments and jury instructions.

C. *Order of Testimony*

Defendant next contends that the trial court erred by requiring him to testify at trial before his expert witness. We disagree.

The People initially moved before trial to exclude all testimony from defendant's clinical psychologist, Dr. Marjorie Graham-Howard. Later, however, the People moved only to limit Dr. Graham-Howard's testimony in various respects, including by requiring defendant to testify before her so that he could lay a foundation for what he told her during her evaluation of him.

The trial court noted that Dr. Graham-Howard could testify about her evaluation and testing of defendant and her findings without defendant testifying first. The court agreed with the People, however, that Dr. Graham-Howard could not testify about the statements defendant made to her during her evaluation unless defendant first testified

12

about those statements. The court explained that there was a "hearsay problem" because Dr. Graham-Howard relied on defendant's statements only; she did not consider any of his medical records. The court thus found that the statements would be inadmissible hearsay unless defendant first laid a foundation for them through his testimony.

Despite defendant's objections, Dr. Graham-Howard testified the day after he testified.

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd, (a).) In general, hearsay is inadmissible unless a statutory exception applies. (Evid. Code, § 1200, subd. (b).)

Experts may rely on hearsay to formulate an opinion, but they cannot "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*People v. Sanchez* (2016) 63 Cal.4th 665, 686 (*Sanchez*).) Experts therefore cannot "present, as facts, the content of testimonial hearsay statements" if the expert "relates [them] as true" unless they are "independently proven." (*Id.* at p. 685.)

We review the trial court's ruling on the admissibility of expert testimony for an abuse of discretion. (*People v. Peoples* (2016) 62 Cal.4th 718, 748.)

The trial court did not abuse its discretion here. The trial court did not force defendant to testify first or to testify at all. Instead, the trial court properly ruled that under *Sanchez* Dr. Graham-Howard could not testify about defendant's hearsay

13

statements he made to her during her evaluation unless they were "independently proven." (*Sanchez, supra*, 63 Cal.4th at p. 685.) As the court correctly observed, the only way to prove those statements was through defendant's testimony given that Dr. Graham-Howard did not rely on any of defendant's medical records to formulate her opinion and instead relied only on her interview of him. The trial court thus properly applied *Sanchez*.

*People v. Hoyt* (2020) 8 Cal.5th 892 (*Hoyt*), shows that the trial court did not err. There, the defendant wanted to introduce expert testimony that he suffered from amnesia and did not recall confessing to a crime. (*Id.* at p. 938.) The trial court ruled that the expert could not "get on the stand and testify to things that he was told [while interviewing [the] defendant] and, in effect, present the defendant's defense," but the defendant could testify about those statements. (*Id.* at p. 937.)

Our Supreme Court found no error because the expert "could not be the source of the evidence that defendant did not remember his confession because that information would be the product of inadmissible hearsay, having originated from [the expert's] interviews with [the] defendant." (*Hoyt, supra*, 8 Cal.5th at p. 938.) As a result, the trial court properly made the admission of the defendant's expert's testimony about what the defendant said during the interviews "contingent on the introduction of foundational evidence. (*Ibid.*) *Hoyt*'s reasoning applies equally here.

Defendant argues otherwise, relying on three inapplicable cases.

In *Brooks v. Tennessee* (1972) 406 U.S. 605, the high court struck down as unconstitutional a Tennessee statute requiring criminal defendants to testify before other defense witnesses or forfeit the right to testify altogether. The trial court "placed no comparable restrictions on defendant." (*Hoyt*, *supra*, 8 Cal.5th at p. 938 [rejecting argument that trial court's ruling was erroneous under *Brooks v. Tennessee*, *supra*, 406 U.S. 605].)

In *People v. Cuccia* (2002) 97 Cal.App.4th 785, the trial court abused its discretion in two ways. First, the trial court refused to let the defendant testify after the prosecutor was permitted to reopen rebuttal. (*Id.* at p. 789.) Second, the trial court warned defense counsel that the court would rule that the defense had rested if it ran out of witnesses. (*Id.* at pp. 790-791.) When a witness could not be located, the trial court reminded defense counsel of its warning and asked whether the defendant would be testifying. (*Id.* at p. 791.) Although the defendant planned on not testifying, he ended up testifying because of the trial court's "threat to consider his case rested if he did not testify." (*Id.* at p. 791.) Nothing like this happened at defendant's trial.

In *People v. Lawson* (2005) 131 Cal.App.4th 1242, the trial court excluded the defendant's key eyewitness because of the defendant's purported failure to notify the prosecutor that the witness would testify. (*Id.* at pp. 1243-1244.) This forced the defendant to testify, and he was impeached with evidence of his prior convictions. (*Id.* at pp. 1243-1244.) Later, however, the court learned the prosecutor had received notice of the witness, so the court reversed itself and allowed the witness to testify. (*Id.* at p.

1245.) The Court of Appeal held the trial court abused its discretion because the trial court's mistake "led the court to force [the defendant] to testify or rest his case without offering any testimony in his defense," thereby "putting his right against self-incrimination on a collision course with his right to present a defense, where one had to yield to the other." (*Id*. at p. 1246.) Again, nothing like this happened here.

For all these reasons, we conclude the trial court did not err by requiring defendant to testify before Dr. Graham-Howard.

D. *Parole Revocation Restitution Fine and Abstract of Judgment*

The trial court imposed a $300 parole revocation restitution fine (§ 1202.45, subd. (c)). The fine applies only to defendants sentenced to a term that includes the possibility of parole. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075.) Defendant thus argues that the fine should be stricken because he was not sentenced to any term that may include a period of parole. The People agree, as do we. We therefore strike the fine. (See *People v. Carr* (2010) 190 Cal.App.4th 475, 482, fn. 6.)

Finally, defendant argues, and the People agree, that the sentencing minute order and abstract of judgment contains clerical errors that must be correct. At sentencing, the trial court sentenced defendant to state prison for life without the possibility of parole plus an indeterminate sentence of 50 years to life. The trial court also imposed the following fines and fees and ordered them all stayed: a $300 restitution fine (§ 1202.4, subd. (b)); the $300 parole revocation restitution fine (§ 1202.45, subd. (c)); a $60 criminal conviction assessment fee [$30 per conviction] (Govt. Code, § 70373, subd.

16

(a)(1)); and a $80 court operations assessment fee [$40 per conviction] (§ 1465.8, subd. (a)(1)). The minute order and abstract of judgment list all those fines and fees, but neither states that the section 1465.8 court operations fee totaled $80. The abstract also does not reflect that the trial court stayed the fines and fees were stayed. We therefore direct the trial court to correct the minute order and abstract of judgment accordingly.

IV.

DISPOSITION

The $300 parole revocation restitution fine is stricken. As modified, the judgment is affirmed. The clerk of the superior court is directed to correct the sentencing minute order and to prepare an amended abstract of judgment to match the court's oral pronouncements regarding fines and fees and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
Acting P. J.

We concur:

FIELDS
J.

RAPHAEL
J.

17